IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SHIRLEY DOUGLAS, Successor in
interest of Schwartz & Associates,
P.A. and Interstate Fire and
Casualty Co.                                                                           PLAINTIFF

VS.                                                           CAUSE NO. 3:12CV523-LG-FKB

TRUSTMARK NATIONAL BANK
and REGIONS BANK                                                                      DEFENDANTS

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO COMPEL ARBITRATION

**BEFORE THE COURT** is Regions Bank's Motion to Compel Arbitration and to Stay Proceedings [18]. Regions contends that an arbitration agreement signed by Plaintiff Shirley Douglas in 2002 for a Union Planters bank account that was closed in 2003 compels her to arbitrate her current, unrelated claim against Union Planters' successor, Regions Bank. The Court has reviewed the Motion, the related pleadings, and the relevant authority and is of the opinion, for the reasons more fully explained below, that the Motion should be denied.

### FACTS

The parties agree that in August 2002 Douglas opened a checking account with Union Planters Bank by signing a Signature Card that bound her to the terms of a Deposit Account Agreement and Disclosure. The Agreement contained an arbitration provision that stated, in part:

> By using or maintaining your account, you agree that, in the event of
> any dispute, disagreement, claim or controversy (a "dispute" or
> "disputes" as defined herein) between you and us or any of our agents

>or employees, or our parent, subsidiary or sister corporations or their employees or agents, any such dispute will, at the election of you or us, be resolved through the process of binding arbitration ("arbitration"), regardless of when the dispute arose. . . . "Disputes" shall have the broadest possible meaning and shall include by way of example and not by limitation, any claim, controversy or dispute arising from or related in any way to (i) this Agreement, (ii) any related agreement (iii) any agreement that this Agreement supercedes, (iv) the relationships, accounts or balances on the accounts resulting from this Agreement or such other agreements, including the validity, enforceability, or scope of this Arbitration provision or any amendments or supplements to this Agreement, (v) any related schedules, rules, statements, or disclosures; (vi) any related services we may provide you at our banking offices, ATM machines, or other facilities; (vii) advertisements, promotions or oral or written statements relating to such agreements, accounts, or balances. Disputes include, but are not limited to, any Disputes based on contract, tort, fraud and other intentional torts, statutes, regulations, common law, equity (including claims of any injury or damage to person or property), claims for breach of fiduciary duty or wrongful acts . . . . This Arbitration Provision . . . will remain in effect if you close your account or accounts with us and is irrevocable.

(Def.'s Mot., Ex. 2 to Ex. A at 5-6, ECF No. 18-1). Douglas' account was closed on or about May 7, 2003. Union Planters merged with Regions Bank on June 29, 2005. Regions argues, and Douglas does not dispute, that Regions is the legal successor to Union Planters.

On June 14, 2012, Douglas sued Regions and Trustmark Bank, claiming that the banks failed to report an attorney to the appropriate authorities for embezzling money from client trust accounts. Douglas contends that if the banks had not breached their alleged duty to report the attorney's misconduct, he would not have had the opportunity to embezzle settlement funds that belonged to Douglas.

Regions argues that, as the successor to Union Planters, it is entitled to enforce the arbitration provision in Douglas' Agreement with Union Planters.

2

Regions further contends that any dispute as to the scope of the arbitration agreement must, itself, be submitted to arbitration. Douglas argues that she did not agree to arbitrate her dispute with Regions, and she claims that this is an issue that may be resolved by the Court.

## DISCUSSION

### I. THE EFFECT OF THE DELEGATION CLAUSE

Section 2 of the Federal Arbitration Act provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Arbitration is, essentially, a matter of contract, and arbitration agreements should be treated like other contracts and enforced according to their terms. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011). Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

"Arbitrability" is the question of whether the parties have agreed to arbitrate a particular dispute. *Id.* Generally, the question of arbitrability is a matter for the courts to decide, rather than an arbitrator. *AT&T Techs, Inc. v. Commc'ns Workers of America*, 475 U.S. 643, 649 (1986). Nevertheless, "[t]he question of 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). The Court cannot simply "assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944 (quoting

3

*AT&T Techs.*, 475 U.S. at 649); *see also Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2777 (2010). An agreement to submit disputes concerning arbitrability to arbitration may be memorialized in a delegation clause. *Agere Sys., Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009). The arbitration provision at issue in the present case contains such a clause, providing that the arbitrator will decide disputes concerning "the validity, enforceability, or scope of this Arbitration provision . . . ." (Def.'s Mot., Ex. 2 to Ex. A at 5, ECF No. 18-1). Even when an agreement contains a delegation clause, a dispute as to "the very existence of an agreement" must first be decided by the court. *DK Joint Venture 1 v. Weyand,* 649 F.3d 310, 317 (5th Cir. 2011).

In support of its Motion, Regions relies on cases in which the parties did not dispute that an arbitration agreement existed between them. For example, in *Allen v. Regions Bank*, 389 F. App'x 441 (5th Cir. 2010), the plaintiffs, a husband and his wife, had both a home equity loan and a demand deposit account with the predecessor banks to Regions. *Id.* at 442. There was no arbitration agreement associated with the home loan, but the plaintiffs had executed a customer agreement containing an arbitration provision when they opened the demand deposit account. *Id.* at 443. When Regions became the successor to those banks, it mailed the plaintiffs a new deposit account agreement containing an arbitration agreement covering "any account, contract, loan, transaction, business, contact, interaction or relationship you may have" with Regions Bank. *Id*. When the husband was diagnosed with cancer, he made a claim under the disability policy that was

4

allegedly purchased in connection with the home loan, and both the bank and the insurance company denied the existence of such a policy. *Id*. at 442. The plaintiffs sued in federal court, and Regions moved to compel arbitration. *Id*. The plaintiffs did not deny that they accepted the terms of the arbitration agreement connected with their demand deposit account, but they argued that it did not apply to their home equity loan. *Id*. at 443, 445. The Fifth Circuit held that the issue was one for the arbitrator, because the plaintiffs challenged the applicability of the arbitration agreement to the dispute, not its validity. *Id*. at 445.

Similarly, in *AmSouth Bank v. Steadman*, 339 F. Supp. 2d 778 (S.D. Miss. 2004), a customer filed a lawsuit against the bank after a relative committed an unauthorized conversion of a certificate of deposit. The customer also had a personal checking account with AmSouth that was governed by an account agreement containing an arbitration clause. *Id*. at 779. That clause mandated arbitration of any dispute between the customer and the bank, as well as any disagreement as to whether any claim was subject to arbitration. *Id*. The Court explained, "[I]t cannot be denied that the 2000 account agreement includes a valid agreement to arbitrate between the parties." *Id*. at 781. Thus, the Court held that the dispute as to the scope of the arbitration clause should be decided by an arbitrator. *Id*.

In another case relied upon by Regions, *Jones v. Regions Bank*, 719 F. Supp. 2d 711 (S.D. Miss. 2010), the plaintiff had financed an automobile through Regions' predecessor, AmSouth. She was later declared disabled by the Social Security

5

Administration and sought to claim the benefits of a credit disability policy that she alleged was purchased at the time she financed the car. *Id.* at 712. When her claim was denied, she sued both Regions and Lot Solutions, Inc., the administrator of the policy, and Regions moved to compel arbitration. *Id.* The loan documents contained an arbitration provision covering any dispute between the customer and the bank, and the plaintiff "admit[ted] she bound herself to contractual arbitration provisions . . . ." *Id.* at 716. She argued that her dispute with Regions was outside the scope of the arbitration provisions and that the provisions did not cover her claims against Lot. *Id.* at 716. Noting that the arbitration clause contained a broad delegation provision, the Court ruled that the claims against Regions must be presented to an arbitrator. *Id.* at 717. That ruling did not, however, automatically apply to Lot, a non-signatory to the policy. *See id.* The Court separately analyzed that issue and held that the plaintiff should arbitrate her claims against Lot because the company fell within the terms of the arbitration provision, which covered "agents, representatives, contractors, and subcontractors." *Id.* Because Lot was a contractor referred to in the agreement, and because the plaintiff's claims arose out of the same agreement that contained the arbitration clause, the court held that her claims against Lot must be arbitrated. *Id.* at 718.

Regions also relies on *Laura Morrison Yarbarough v. Regions Nat'l Bank & Trust Co.*, No. 3:10cv161 HTW-LRA, 2012 WL 4596181 (S.D. Miss. Sept. 4, 2012). In *Yarbarough*, the plaintiff sued the banks for negligence in allowing her daughter and son-in-law to fraudulently transfer cash from her accounts. *Id.* at *4. She had

6

opened a checking account with a predecessor bank in 1990, and that account was later converted to a Regions account following a merger. *Id.* Plaintiff opened another account with Regions just before she filed her lawsuit. *Id.* Regions had sent her a revised deposit agreement containing an arbitration clause when the earlier account was converted, and she signed documents containing arbitration provisions when she opened the later account. *Id.* The plaintiff did not contend that there was no agreement to arbitrate; rather, she argued that the provisions should not apply because they deprived her of her constitutional right to a jury trial and were contained in documents that a person of her advanced age would find difficult to read. *Id.* The Court found that those issues should be submitted to arbitration. *Id.* at *8.

Regions also argues that it is entitled to arbitration pursuant to *Agere Systems, Inc., v. Samsung Electronics Company Ltd.*, 560 F.3d 337 (5th Cir. 2009). The relationship giving rise to the lawsuit in *Agere Systems* began when Samsung and AT&T entered into a patent cross-licensing agreement with an accompanying payment structure arrangement that expired in 1994. *Id.* at 338. The parties agreed that they would thereafter negotiate in good faith for a new arrangement. *Id.* That negotiation occurred, resulting in a new agreement that lasted until 1999, which again contained a provision for good faith negotiation after that date. *Id.* Lucent Technologies became AT&T's successor in interest and, in 2000, it negotiated a new payment structure agreement with Samsung that expired in 2004. *Id.* The 2000 agreement contained an arbitration provision with a clause delegating

questions of arbitrability to the arbitrator. *Id.* In 2004, Agere became Lucent's successor and began negotiations for a new agreement. *Id.* In 2006, Agere and Samsung agreed on an interim payment structure in an agreement that included a "best efforts" negotiation agreement, but failed to include a reference to arbitration. *Id.* at 339. When subsequent negotiations broke down, Agere filed a lawsuit, and Samsung requested arbitration under the 2000 agreement. *Id.* Agere argued that the 2000 agreement containing the arbitration clause had expired, and the 2006 agreement controlled. *Id.* Samsung argued that the 2000 agreement continued to govern the process of reaching a new agreement. *Id.* at 340. While not deciding the merits of the issue, the Fifth Circuit held that there was a persuasive argument that the arbitration clause covered the dispute and referred the case to arbitration. *Id.*

The *Agere* decision must be considered in conjunction with the Fifth Circuit's subsequent decision in *DK Joint Venture 1 v. Weyand*, 649 F.3d 310 (5th Cir. 2011). In *Weyand*, several business entities claimed that they had been defrauded by two individuals who served as the chief executive officer and chief financial officer of several corporations. *Id.* at 312. The business entities pursued arbitration against the CEO, CFO, and the corporations, relying on arbitration provisions contained in contracts between the business entities and the corporations. *Id.* at 313. The arbitration panel found in favor of the business entities, and the district court confirmed the arbitration award despite the CEO and CFO's arguments that they had never agreed to arbitration. *Id.* at 313-14. The Fifth Circuit reversed the district court's decision in part, finding that the CEO and CFO were not bound by

the arbitration provisions. *Id.* at 318-19. The Fifth Circuit rejected the business entities' reliance on *Agere*, stating, "[I]n *Agere*, an arbitration agreement undisputably existed between the parties, and the dispute was over 'whether the arbitration clause [was] still in effect.'" *Id.* at 317. The Court held that "a dispute over whether the parties entered into any arbitration agreement in the first place" must be decided by the courts. *Id.*

In the present case, Douglas argues that she never agreed to arbitrate disputes with Regions. In the opinion of the Court, this case is more analogous to *Weyand* than to the cases relied on by Regions. Thus, this Court must first decide that a valid arbitration agreement exists between Douglas and Regions before the case can be submitted to arbitration.

## II. WHETHER A VALID ARBITRATION AGREEMENT EXISTS BETWEEN DOUGLAS AND REGIONS

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Howsam*, 537 U.S. at 83. The purpose of the FAA is to give arbitration agreements the same force and effect as other contracts. *See* 9 U.S.C. § 2. Accordingly, when determining whether the parties agreed to arbitration, courts apply "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago,* 514 U.S. at 944; *see also Todd v. S.S. Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329, 336 (5th Cir. 2010) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009))

9

(holding that courts should look to state law when determining whether an arbitration clause can be invoked by a non-signatory).

The Mississippi Supreme Court has held that a signatory's heir cannot disclaim an arbitration agreement where the language of the arbitration agreement expressly extended its terms to "heirs, successors and administrators." *Smith Barney, Inc. v. Henry*, 775 So. 2d 722, 727 (¶¶19-20) (Miss. 2001). However, the Mississippi Supreme Court has refused to permit non-signatories to enforce an arbitration agreement that failed to name them. *See Qualcomm Inc. v. Am. Wireless License Grp., LLC*, 980 So. 2d 261, 269 (¶18) (Miss. 2007). In *Qualcomm*, the arbitration agreement required arbitration "at the election of either Buyer or Seller." *Id*. The Seller's current and former officers argued that they could enforce the arbitration provision against members of the Buyer (a limited liability company). *Id*. Recognizing that none of the parties was a signatory to the arbitration agreement, the court enumerated the theories in which a non-signatory may, nonetheless, enforce the agreement: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary. *Id*. at 269 (¶17) (quoting *Bridas S.A.P.I.C. v. Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003)). The court in *Qualcomm* concluded:

> The issue in this case is a rather simple question of contract interpretation. By the plain terms of the contract, it is evident that the parties simply did not agree to extend to non-signatories the benefit of the arbitration clause, for they easily could have stated so. The contract clearly reads that disputes may be submitted to arbitration at the election of either Buyer or Seller. Because the defendants are neither the Buyer nor Seller, they are not entitled to enforce arbitration. As we have stated

> before, this Court must "accept the plain meaning of a contract as the intent of the parties if no ambiguity exists." *B.C. Rogers*, 911 So. 2d at 487 (citing *I.P. Timberlands*, 726 So. 2d at 108). Moreover, "we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *B.C. Rogers*, 911 So. 2d at 487 (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).

*Id.*; *but see Sawyers v. Herrin-Gear Chevrolet Co., Inc.*, 26 So. 3d 1026, 1038-39 (¶34) (Miss. 2010) (distinguishing *Qualcomm* where non-signatory sought to compel arbitration clause contained in the contract that was the subject matter of the lawsuit).

In the present case, the parties to the Agreement containing the arbitration clause are Douglas (referred to throughout the Agreement as "you" and "your") and Union Planters (referred to throughout the Agreement as "we," "our," and "us"). (Def.'s Mot., Ex. 2 to Ex. A, ECF No. 18-1). The arbitration clause applies to disputes "between you and us or any of our agents or employees or our parent, subsidiary or sister corporations or their employees or agents." (*Id.*) The Agreement provides that arbitration could be requested at the election of either Douglas or Union Planters. (*Id.*) Significantly, there is no provision in the Agreement extending its scope to disputes between Douglas and Unions Planters' successors, such as Regions. (*See id.*) Thus, under Mississippi law, Regions' status as a successor to Union Planters does not make it a party to the agreement to arbitrate, nor does it automatically permit Regions to enforce the arbitration clause of the original agreement.

11

Mississippi recognizes that "a non-signatory may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency." *Scruggs v. Wyatt*, 60 So. 3d 758, 767 (¶20) (Miss. 2011). Thus, a non-signatory to an arbitration agreement may enforce arbitration where principles of equitable estoppel apply. *B. C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 491-92 (¶28) (Miss. 2005) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000)). The principle of equitable estoppel applies where the lawsuit arises out of the terms of the agreement containing the arbitration provision, where the allegations raised by the signatory involve "substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract," or where the signatory's allegations involve or depend on the terms of the agreement containing the arbitration clause. *B. C. Rogers Poultry*, 911 So. 2d at 491-92 (¶¶28-30). The present case does not relate in any way to the Agreement containing the arbitration clause. Therefore, Regions cannot rely on the doctrine of equitable estoppel to require Douglas to submit her claims to arbitration.

**CONCLUSION**

The Defendant has been unable to identify any contract or agency principle that would permit Regions to enforce the arbitration clause at issue. Regions has likewise been unable to cite authority tending to clarify the question here. Can a successor corporation that was a non-signatory to an arbitration agreement, and not within any group named in the agreement as a potential party, be permitted to invoke arbitration on a claim completely unrelated, both in time and subject matter,

to the original agreement? Douglas agreed to arbitrate disputes with Union Planters, its parent, sister, or subsidiary corporations, or their employees or agents. She did not agree to arbitrate disputes with Union Planters' successor, and she is not relying on the Union Planters' Agreement to pursue her claims in the present case. Therefore, Regions cannot invoke the arbitration clause contained in the Union Planters' Agreement.

**IT IS THEREFORE ORDERED** that Regions Bank's Motion to Compel Arbitration and to Stay Proceedings [18] is **DENIED.**

**IT IS FURTHER ORDERED** that, in accordance with L.U. Civ. R. 16(3)(E), Plaintiff is directed to notify United States Magistrate Judge Keith Ball of this decision and submit a proposed Order lifting the stay of discovery in this case.

**SO ORDERED AND ADJUDGED** this the 5th day of November, 2012.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE